886 F.Supp. 750 (1995)
UNITED STATES of America, ex rel. Gary R. EITEL, Plaintiff,
v.
EVERGREEN INTERNATIONAL AIRLINES, INC.; et al., Defendants.
No. C94-1017Z.
United States District Court, W.D. Washington, Northern Division.
June 1, 1995.
Hagens & Berman, Steve W. Berman, Seattle, WA, for plaintiff.
Perkins Coie, Marc Allen Boman, Seattle, WA, for defendants.

ORDER
ZILLY, District Judge.
THIS MATTER comes before the Court on Defendants' motion to dismiss for lack of subject matter jurisdiction (docket no. 52). *751 The Court previously denied Defendants' concurrently noted motion to dismiss for failure to state a claim (docket no. 20). See Minute Order (docket no. 83).
Plaintiff Gary Eitel brings this qui tam action under the False Claims Act, 31 U.S.C. §§ 3729-3731. Plaintiff alleges that Defendant Evergreen International Airlines, Inc., its parent corporation, Evergreen International Aviation, Inc. (EIA), and EIA's other subsidiaries, Evergreen Aviation Ground Logistics Enterprises, Evergreen Air Center, Inc., Evergreen Aircraft Sales & Leasing Co., and Evergreen Venture, Inc., (collectively "Evergreen"), knowingly presented false or fraudulent claims for payment or approval to the United States Postal Service. Evergreen moves to dismiss under Fed.R.Civ.P. 12(b)(1) on the ground that the False Claims Act specifically prohibits the Court from asserting jurisdiction over Plaintiff's suit.
On April 20, 1995, the Court heard oral argument from the parties on Evergreen's Rule 12(b)(1) motion to dismiss. Having considered the oral arguments of the parties, and having reviewed all papers filed in support of, and in opposition to,[1] the motion to dismiss for lack of subject matter jurisdiction, the Court hereby GRANTS Evergreen's motion and DISMISSES the case.

Background
In April 1987, following an evaluation of 18 bids from various aviation contractors, the Postal Service awarded Contract ANET 87-02 to Evergreen. Contract Audit, at 2 (April 27, 1989), Exhibit 22 to Declaration of Marc Boman, Attachment to Memorandum in Support (docket no. 56) [hereinafter "Boman Declaration"]. Contract ANET 87-02 was a two-year, fixed-price contract to transport 274,500 pounds per day of Express and Priority Mail through a 21-city network. Id. at 1. Evergreen's performance on the contract began in June 1987, and the contract expired in August 1989. First Amended Complaint, at ¶ 44 (docket no. 17).
During this same period, Evergreen also rendered performance under Contract ANET 87-03. Contract ANET 87-03 was initially awarded to Kitty Hawk Group, Inc., but was novated to Evergreen in April 1989. Advisory Report, at 1 (April 14, 1989), Exhibit 23 to Boman Declaration. Contract ANET 87-03 required transportation of 123,000 pounds of mail per day through a 10-city network. First Amended Complaint, at ¶ 40 (docket no. 17). Plaintiff alleges that Contract ANET 87-03 continued until late 1992, First Amended Complaint, at ¶ 46; however, Evergreen has submitted a letter from the Postal Service memorializing a mutually agreed upon termination date of July 3, 1989. Exhibit 1 to Boman Declaration. The Court need not resolve this factual dispute as it bears little or no relevance to the issues presented in this Rule 12(b)(1) motion to dismiss.
Shortly after the award of Contract ANET 87-02, several competing bidders filed protests. The Postal Service sustained one of these protests on grounds that the protestor's proposal had been improperly evaluated and actually constituted the lowest bid. Decision, at 9 (P.S. Protest No. 87-40, TPI Int'l Airways, Inc.), Exhibit 2 to Boman Declaration. The Postal Service, however, declined to order termination of Evergreen's contract as not in the best interests of the Postal Service. Id. at 10-11. Contracts ANET 87-02 and ANET 87-03 were also the subject of Postal Service reports, a public hearing, and various media articles. See Exhibits 4-23, 27, & 31-33 to Boman Declaration. These publications are discussed later in further detail.
During the period that Evergreen was performing under both contracts, the subsidiary Evergreen International Airlines, Inc. hired Plaintiff. Declaration of Penn Stohr, at ¶ 4, Attachment to Memorandum in Support (docket no. 56). Plaintiff worked as a pilot trainee until his voluntary termination approximately one month later, on May 25, 1989. Exhibit C to Declaration of Penn Stohr, Attachment to Memorandum in Support (docket no. 56).
*752 In early 1993, almost four years after Plaintiff's voluntary termination, he reported alleged misconduct by Evergreen to several government officials, including an agent of the Office of Inspector General for the United States Department of Agriculture, former Senator James Sasser, and Representative Charlie Rose. First Amended Complaint, at ¶ 37 (docket no. 17). Plaintiff claims that he learned of Evergreen's alleged malfeasance during his one month of employment. See id. at ¶¶ 19-36. Before making his reports to the government, however, Plaintiff obtained a redacted copy of the Postal Inspection Service's Audit of Contract ANET 87-02 (Exhibit 22 to Boman Declaration) from a source other than the Postal Service. Compare Letter from Plaintiff to Postal Service, Exhibit 28 to Boman Declaration ("In fact, the abbreviated and incomplete report just described, that I have in hand, was obtained under provisions of FOIA by others.") with Second Declaration of Gary Eitel, at ¶ 22 (docket no. 66). Plaintiff subsequently requested, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, copies of Postal Inspector reports pertaining to aviation contracts awarded to Evergreen. In April 1993, the Postal Service provided to Plaintiff redacted copies of three reports, which are contained in Exhibits 21, 22 & 23 to Boman Declaration. See Exhibit 29 to Boman Declaration.
On July 6, 1994, over five years after he left Evergreen, Plaintiff filed this qui tam action under the False Claims Act. On November 22, 1994, Plaintiff filed his First Amended Complaint, in which he alleges that: (1) Evergreen gave Postal Service officials illegal gratuities; (2) Evergreen used its role as a critical CIA contractor to gain an advantage over competitors; (3) Evergreen induced officials to provide preferential treatment during both the contract award process and the performance of the contracts; (4) Evergreen induced officials to approve excessively favorable contract terms; and (5) Evergreen induced officials to permit the use of Postal Service designated aircraft for other clients, including the CIA. First Amended Complaint, at ¶¶ 14-18 (docket no. 17).
In this motion to dismiss, Evergreen contends that Plaintiff's claims are based on allegations or transactions previously publicly disclosed and that Plaintiff was not the "original source" of the information. Thus, Evergreen argues, under the provisions of the False Claims Act, the Court lacks subject matter jurisdiction.

Analysis

A. Standard of Review

The plaintiff bears the burden of establishing subject matter jurisdiction. United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 409 n. 5 (9th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). When, as is the case here, "the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." Thornhill Publishing Co. v. General Tel. & Elec. Corp., 594 F.2d 730, 733 (9th Cir.1979). With regard to motions under Rule 12(b)(1), attacking the existence in fact of subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977)).

B. The False Claims Act

Evergreen's motion challenges the Court's jurisdiction under the False Claims Act. The Act assesses penalties against one who "knowingly presents ... a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1). The Act permits private persons to bring civil actions for violations of § 3729. 31 U.S.C. § 3730(b). Before proceeding with the suit, however, a qui tam plaintiff must disclose the evidence of fraud to the government, which then has 60 days to intervene in the action. 31 U.S.C. § 3730(b)(2). If the government chooses not to intervene, as is the case here, the qui tam plaintiff may proceed with the suit, unless one of the jurisdictional bars defined in 31 U.S.C. § 3730(e) *753 applies. Specifically, § 3730(e)(4)(A) provides:
No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
Section 3730(e)(4)(A) serves as a bar to a quitam action only when "public disclosure of allegations or transactions" has occurred. Wang v. FMC Corp., 975 F.2d 1412, 1416 (9th Cir.1992). Only if public disclosure has occurred must the Court proceed to the second inquiry, i.e., whether the qui tam plaintiff was an "original source." Id. at 1416, 1417. Section 3730(e)(4)(B) defines an original sources as:
an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.
Here, the Court finds that this action is based on allegations or transactions already publicly disclosed. The Court therefore must address both prongs of the jurisdictional test, and the Court does so seriatim.

1. Public Disclosure

The Ninth Circuit has not yet had occasion to interpret the statutory language "public disclosure of allegations or transactions." The D.C. Circuit, however, has construed the phrase as barring qui tam actions "only when either the allegation of fraud or the critical elements of the fraudulent transactions themselves were in the public domain." United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C.Cir. 1994). The Eighth Circuit is in accord. United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1514 (8th Cir.1994), petition for cert. filed, 63 U.S.L.W. 3788 (1995) ("[T]he bar is given effect when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud.").
Here, either the allegations themselves or the essential elements of the misconduct were in the public domain prior to Plaintiff's disclosures of them. In August 1988, over eight months before Plaintiff began working for Evergreen, the Oregonian ran a nine-part story on the company. The nine articles make repeated reference to Evergreen's alleged ties to the CIA, see Exhibits 5-13 to Boman Declaration, and the eighth article questions how Evergreen obtained one of its contracts with the Postal Service when its bid was higher than five of the six other finalists, see Exhibit 12 at P1 & P3 (Competitor Kay Cohlmia "thought Evergreen had won [the postal contract] unfairly by being "wired in" to the Reagan Administration.... After learning of the award, Congressman Leland began an investigation of his own, charging in a letter to the Postal Service and in subsequent hearings that Evergreen had "a spotty past" and was said to be connected to the CIA.").
In August 1989, almost 3½ years before Plaintiff initially reported Evergreen's alleged misconduct, the Aviation Daily summarized the findings in a Postal Service audit[2] of the Evergreen contract as follows:
Postal Service audit of the Evergreen contract shows Evergreen initially bid $68.4 million and was awarded the contract April 24, 1987. This escalated to $95.7 *754 million annually as a result of economic cost adjustments, some made without investigation or questions, and 11 contract amendments by unqualified and unauthorized persons, said the audit, which concluded Evergreen's rate of return was "excessive."
The contract included an economic cost adjustment clause based on the Producer Price Indexes for fuel and labor and resulted in a price increase of $17.3 million annually, although "little, if any, actual cost increases were experienced by the contractor," said the audit. Moreover, Evergreen was "allowed to submit revisions to its best and final offer as late as April 21, two days after the close of negotiations." It says this "may have given Evergreen an unfair advantage over other bidders," ...
The audit found the contract "to be absent other clauses which are routinely used in Postal Service contracting to further protect the organization's interests." It also found the Postal Service "is paying for lift that is not being provided by the contractor." The auditors said, "During our review, conditions were identified which give the appearance of unethical conduct and possible conflicts of interest by postal employees directly involved with the Evergreen contract. An analysis of the contractor's financial records and discussions with postal personnel disclosed evidence of gratuities received by postal employees. The gratuities included meals as well as air travel on Evergreen's corporate jet." The audit said "discussions with the contractor revealed that aircraft painted with the logos of the Postal Service have been used for purposes other than transportation of U.S. mail."
Exhibit 19 to Boman Declaration. The National Journal and the Washington Post later ran similar accounts. See Exhibits 18 & 20 to Boman Declaration. Both articles appeared in the fall of 1992, before Plaintiff brought his claims to the attention of government officials.
Plaintiff's First Amended Complaint essentially repeats the allegations made by the Postal Service contract audit and echoed by the media. See First Amended Complaint, at ¶¶ 47 ("Evergreen paid gratuities"), 53 ("allowed Evergreen to submit revisions up until April 21"), 57 ("using aircraft with Postal Service logos for purposes other than delivering U.S. mail"), 61 (amendments "uniformly approved ... without analysis"), 75-110 (describing contract amendments), & 111-129 (unwarranted price escalation). Thus, the Court concludes that Plaintiff's claims are based on publicly disclosed allegations or transactions within the meaning of § 3730(e)(4)(A).
Plaintiff does not dispute that the factual allegations in his First Amended Complaint are based on information already in the public domain; rather, Plaintiff argues that his suit is not barred because the essential element of Evergreen's alleged fraud, i.e., its intent to defraud, was not previously publicly disclosed. Plaintiff's contention lacks merit. First, "intent to defraud" does not constitute an element of a False Claims Act violation. 31 U.S.C. § 3729(a)(1). The requisite scienter under the False Claims Act is "actual knowledge" that the claim for payment or approval is false or fraudulent or "reckless disregard of the truth or falsity" of the claim. Wang, 975 F.2d at 1420. In this case, one may deduce knowledge or reckless disregard from the publicly available information. See, e.g., Aviation Daily, Exhibit 19 to Boman Declaration. Contrary to Plaintiff's contention, all of the essential elements of the alleged misconduct (knowing presentment of a false or fraudulent claim for payment) were in the public domain.
Second, even if intent was a necessary element, Plaintiff presents no direct evidence of intent, but merely infers intent from the factual allegations. Plaintiff offers nothing more than what the public already knows. Compare United States ex rel. LeBlanc v. Raytheon Co., 874 F.Supp. 35, 39 (D.Mass. 1995) (Court unpersuaded by relator's use of "special expertise" to deduce contract violations from the public allegations already made and relator's failure to proffer any previously undisclosed substantive information); Wang, 975 F.2d at 1417 ("It is true that Wang's allegation about the Bradley is supported by a few factual assertions never before publicly disclosed; but "fairly characterized" *755 the allegation repeats what the public already knows: that serious problems existed with the Bradley's transmission.").

2. Original Source

Because Plaintiff's claims are based on publicly disclosed allegations or transactions, Plaintiff may maintain this suit only if he qualifies as an "original source" within the meaning of § 3730(e)(4)(B). Plaintiff must show that he "(1) has direct and independent knowledge of the information, (2) voluntarily provided the information to the government, and (3) either directly or indirectly assisted in the public disclosure of the information." United States ex rel. Fine v. Chevron, U.S.A., Inc., 39 F.3d 957, 961 (9th Cir.1994). The Court concludes that Plaintiff does not qualify as an original source because he played no part in the public disclosure of the information at issue.[3]
To maintain a qui tam action, the relator must have directly or indirectly reported the allegations to either the government or the media before the information became public knowledge. As the Ninth Circuit has explained:
If ... someone republishes an allegation that already has been publicly disclosed, he cannot bring a qui tam suit, even if he had "direct and independent knowledge" of the fraud. He is no "whistle-blower." A "whistleblower" sounds the alarm; he does not echo it. The Act rewards those brave enough to speak in the face of a "conspiracy of silence," and not their mimics.
Wang, 975 F.2d at 1419.
The exact time and content of Plaintiff's disclosures to the government remain unclear. Plaintiff alleges that he "raised Evergreen's improper conduct with representatives of certain congressmen and senators in 1992" and reported his "concerns about Evergreen's illegal activities to government investigators in January 1993." Second Declaration of Gary Eitel, at ¶ 26 (docket no. 66); compare First Amended Complaint, at ¶ 37 ("In early 1993, Mr. Eitel provided all the information that he possessed regarding Evergreen's abuse of its Postal Service contracts to several government officials ... In addition, around this same time, Mr. Eitel reported his knowledge ... to the offices of former Senator James Sasser and Representative Charlie Rose ..."). Giving Plaintiff the benefit of the doubt, and assuming that he provided the information at issue to the government sometime in 1992, his disclosure still comes too late. The Postal Service issued its two advisory reports and the audit of Contract ANET 87-02 in early 1989. The Aviation Daily article summarizing the contract audit appeared in August 1989. Also in August 1989, a Subcommittee of the House Committee on Post Office and Civil Service held a hearing on the Express Mail contract. See Exhibit 27 to Boman Declaration. Neither party contends that Plaintiff offered any testimony at that hearing.
The Court concludes that the allegations of illegal gratuities, connections to the CIA, receipt of preferential treatment and excessively favorable contract terms, and use of Postal Service aircraft for other clients were in the public domain long before Plaintiff provided that same information to government officials. Section 3730(e) was added in 1986 to the False Claims Act as a means of increasing "private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons *756 who heard of fraud but played no part in exposing it." Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 565 (11th Cir.1994). On balance, the Court cannot say that Plaintiff here fits within the whistleblower paradigm for which the False Claims Act provides incentives to sue. Plaintiff appears to be nothing more than a "second toot." See Wang, 975 F.2d at 1419. The Court therefore GRANTS Defendants' motion to dismiss for lack of subject matter jurisdiction and DISMISSES this action pursuant to Fed.R.Civ.P. 12(h)(3).
IT IS SO ORDERED.
NOTES
[1] By Minute Order dated April 12, 1995 (docket no. 83), the Court denied Plaintiff's motion to file a surreply (docket no. 75). The Court has not considered the arguments Plaintiff presented in his surreply, but has reviewed United States ex rel. LeBlanc v. Raytheon Co., 874 F.Supp. 35 (D.Mass.1995), which was cited by both parties.
[2] In 1989, the Postal Service issued advisory reports on Contracts ANET 87-02 & ANET 87-03, and performed an audit on Contract ANET 87-02. See Exhibits 21-23 to Boman Declaration. Defendants offer the reports and audit as evidence that Plaintiff's claims are based on publicly disclosed allegations or transactions. The Postal Service, however, did not disseminate these documents; rather, the Postal Service labeled them "restricted information" "not to be released outside the Postal Service." Id. The parties, through FOIA requests, eventually obtained redacted versions of the reports and audit. Whether the availability through FOIA of these documents in redacted form constitutes "public disclosure" remains unclear, and the Court need not decide the issue because the Aviation Daily article fully summarized the findings of the audit on Contract ANET 87-02, thereby publicly disclosing the allegations made in the audit.
[3] With regard to the other two prongs of the "original source" standard, the parties do not dispute that Plaintiff voluntarily disclosed his information to the government before filing this qui tam action, and the Court makes no findings as to whether Plaintiff had "direct and independent knowledge" of the information on which his claims are based. Plaintiff offers contradictory evidence regarding the manner in which he learned of Evergreen's allegedly fraudulent behavior. On the one hand, Plaintiff asserts that he gained his knowledge during the course of his brief employment with Evergreen. Second Declaration of Gary Eitel, at ¶¶ 16-21 (docket no. 66). On the other hand, Plaintiff indicates that he based some of his claims on government documents. Id. at ¶¶ 22 & 23 ("after having reviewed the reports"); First Amended Complaint, at ¶¶ 47, 65-68, 70, & 113 (alluding to the contents of the Postal Service's contract audit). The Court has serious doubts about the extent to which Plaintiff obtained his information as a result of working for Evergreen; however, because the Court concludes that Plaintiff did not directly or indirectly assist in the public disclosure of the information, the Court need not decide whether Plaintiff satisfies the direct and independent knowledge requirement.